EDWIN HERNÁNDEZ TORRES, AIDA CARRERAS COELLO, ETC., demandantes y recurridos, *v.* JOSÉ PADILLA MORALES, ETC., demandados y recurrentes.

*Número:* RE-94-613          *Resuelto:* 24 de abril de 1997

*Rafael Sánchez Hernández*, abogado de los recurrentes; *Iván Durant* y *Mario A. Prieto Batista*, abogados de los recurridos.

SENTENCIA

I

El 6 de agosto de 1992, Edwin Hernández Torres y Aida Carreras Coello, por sí y en representación de su sociedad de gananciales, demandaron a José Padilla Morales, su esposa y la sociedad de gananciales, por *incumplimiento de contrato* más daños y perjuicios.[1]

El 27 de agosto de 1992, Juan Sotomayor Ruiz demandó para el cobro de dinero a Padilla Morales y la corporación Restaurant El Gijonés, Inc. Por estar ambos pleitos íntimamente relacionados, previa solicitud, fueron consolidados.

Luego de la vista en su fondo, el ilustrado Tribunal de Instancia, Sala de San Juan (Hon. José E. Broco Oliveras, Juez), condenó al demandado Padilla Morales a satisfacer con veinticuatro mil dólares ($24,000) a Sotomayor Ruiz, más intereses legales, más tres mil dólares ($3,000) por honorarios de abogado. Además, lo condenó a pagar veinticinco mil dólares ($25,000) a Hernández Torres y Carreras Coello, más tres mil dólares ($3,000) invertidos en un negocio y tres mil dólares ($3,000) en honorarios de abogado.

Esta sentencia estuvo fundamentada en la demostración de los hechos, que se remontan al 1ro de abril de 1992, fecha cuando Padilla Morales, en representación de la corporación *Restaurant El Gijonés* (en adelante *El Gijonés*), compró a Sotomayor Ruiz el negocio *Cafetería Restaurant Tu Casa* por treinta y cinco mil dólares ($35,000).[2] En el contrato de compraventa se acordó que *El Gijonés* pagaría cinco mil dólares ($5,000) al firmarse el contrato y cinco mil dólares ($5,000) dentro de los treinta (30) o cuarenta y cinco (45) días desde su otorgamiento y veinticinco (25) pa-

---

[1] La demanda original se enmendó el 25 de noviembre de 1992 y fue contestada por los demandados el 28 de septiembre de 1992.

[2] El *Restaurant El Gijonés* estuvo inactivo por espacio de dos (2) años y Padilla Morales utilizó la entidad corporativa para realizar la compraventa.

gos mensuales de mil dólares ($1,000) hasta totalizar los treinta y cinco mil dólares ($35,000) pactados. Los veinticinco mil dólares ($25,000) aplazados fueron garantizados por un pagaré suscrito por Padilla Morales, en representación de *El Gijonés.* Éste establecía que su incumplimiento conllevaría que el acreedor podía declararlo vencido y proceder a cobrarlo. *El Gijonés* incumplió; sólo pagó once mil dólares ($11,000).

El 3 de junio de 1992, previa autorización de su Junta de Directores, *El Gijonés* vendió el *Restaurant Tu Casa* a su Presidente, Padilla Morales, *asumiendo éste, en su carácter personal,* la deuda con Sotomayor Ruiz. Al hacerlo, la Junta de Directores indicó que Padilla Morales había aportado para la compraventa los once mil dólares ($11,000) antes referidos, en calidad de préstamo a *El Gijonés.*

El 15 de junio de 1992, Padilla Morales vendió a Edwin Hernández Torres y Aida Carreras Coello el *Restaurant Tu Casa,* por el precio de cincuenta mil dólares ($50,000), de los cuales los compradores pagaron veinticinco mil dólares ($25,000) el día del contrato y acordaron que pagarían el remanente en mensualidades de mil dólares ($1,000) hasta su saldo total.([3]) También acordaron que los compradores Hernández-Carreras *no* asumirían cuentas a cobrar ni cuentas a pagar de clase alguna. *Padilla Morales no les informó de la deuda que tenía con Sotomayor Ruiz, y nunca los reunió.*

Hernández Torres otorgó un contrato de arrendamiento por diez (10) años con el dueño del inmueble donde se ubica el negocio. Tomó posesión del negocio y, luego de invertir aproximadamente tres mil dólares ($3,000) para acondicionarlo, comenzó a operarlo. Poco después, a mediados de julio, recibió una llamada de la Sra. Luisa Ruiz, madre de Sotomayor Ruiz, quien le informó sobre la deuda y otros

---

([3]) Padilla Morales alegó que dicha compraventa se llevó a cabo en virtud del poder conferídole mediante una resolución de la corporación *Restaurant El Gijonés.* En estos dos (2) negocios, Padilla Morales obtuvo una ganancia de quince mil dólares ($15,000).

aspectos del negocio original realizado entre Padilla Morales y Sotomayor Ruiz. Tras varias gestiones infructuosas, Hernández Torres logró comunicarse con Padilla Morales y le informó de lo sucedido.

Padilla Morales le indicó a Hernández Torres que continuara pagándole la deuda y, *además, que pagara los veinticuatro mil dólares ($24,000) adeudados a Sotomayor Ruiz.* Insatisfecho, Hernández Torres entregó el negocio y demandó a Padilla Morales por incumplimiento de contrato, más daños y perjuicios. Padilla Morales dejó de pagar la deuda a Sotomayor Ruiz, quien a su vez lo demandó.

No conforme con la sentencia antes aludida, Padilla Morales acudió ante nos.([4])

## II

A los fines de simplificar la discusión, procedemos a considerar los errores uno (1) y tres (3) conjuntamente, por ambos atender el aspecto del cumplimiento de los contratos suscritos por las partes.([5])

Padilla Morales argumenta, en su primer señalamiento, que incidió el tribunal al no determinar que Hernández Torres incumplió los términos del contrato. De igual forma,

---

([4]) Discute los señalamientos siguientes:

"1. Cometió grave error de derecho el Tribunal sentenciador al no determinar que la parte recurrida incumplió con los términos del contrato, que ésta otorgó con el recurrente y por consiguiente, condenarlo al pago del valor del mismo.

"2. Cometió grave error de derecho el Tribunal sentenciador al no eliminar y utilizar en su sentencia como prueba, parte del testimonio del recurrido Edwin Hernández a pesar del mismo haber sido objetado oportunamente por la representación legal del recurrente por los fundamentos que dicho testimonio era novel, no contenido en las alegaciones de la demanda ni tampoco como teoría en la conferencia con antelación al juicio y que la mejor evidencia sobre los términos del contrato lo era el propio documento (contrato) el cual estaba disponible y admitido como evidencia.

"3. Cometió grave error de derecho el Tribunal sentenciador al concluir que fue la parte recurrente la que había incumplido los términos del contrato otorgado entre el recurrente y los recurridos por ser dicha determinación contraria a la prueba presentada.

"4. Cometió grave error de derecho el Tribunal sentenciador al imponerle honorarios de abogado a la parte recurrente." Petición de revisión, págs. 6–7.

([5]) Sabido es que un contrato existe desde que una o varias personas consienten en obligarse, respecto de otra u otras, a dar alguna cosa o prestar algún servicio. Art. 1206 del Código Civil, 31 L.P.R.A. sec. 3371. Toda obligación que nace de un contrato

en su tercer señalamiento, cuestiona la conclusión de que fue él quien lo incumplió. *No tiene razón.*

Los hechos probados revelan que en el *primer* contrato de compraventa otorgado entre Padilla Morales y Sotomayor Ruiz éste se obligó a entregarle el negocio el *Restaurant Tu Casa*. Padilla Morales pagaría, como precio total, treinta y cinco mil dólares ($35,000). Padilla Morales, a través de su propio testimonio, admitió la existencia de esa deuda con Sotomayor Ruiz. Aceptó, además, que dejó de satisfacer los mil dólares ($1,000) mensuales estipulados.

También la prueba refleja que, pocos días después, Padilla Morales suscribió un *segundo* contrato y le vendió a Hernández Torres el negocio. Fue un contrato válido.(⁶) Padilla Morales se obligó a entregar el *Restaurant Tu Casa* y Hernández Torres pagaría como *único* precio cincuenta mil dólares ($50,000). El ilustrado tribunal sentenciador estimó que Padilla Morales también incumplió al no informar a Hernández Torres y luego exigirle el *pago de la deuda que tenía con Sotomayor Ruiz, además del pago de la deuda contraída con él.*

Correctamente concluyó el tribunal que esa conducta estaba reñida con el estado de derecho prevaleciente en cuanto al cumplimiento de las obligaciones y, más aún, del principio rector de buena fe que debe imperar entre los contratantes. No cabe duda de que la pretensión de Padilla Morales de intentar variar unilateralmente los términos originales del contrato de compraventa —al exigirle a Hernández Torres asumir la deuda que tenía con Sotomayor

tiene fuerza de ley entre los contratantes, quienes deben cumplirla al tenor de éste. Art. 1044 del Código Civil, 31 L.P.R.A. sec. 2994. Una voluntad así vertida, es la ley entre las partes. *Ganadería Esperanza, Inc. v. Vda. de Castañer*, 108 D.P.R. 400, 414 (1979); *Casanova v. P.R.-Amer. Ins. Co.*, 106 D.P.R. 689 (1978); *Hernández v. Méndez & Assoc. Dev. Corp.*, 105 D.P.R. 149 (1976); *Clausells v. Salas*, 51 D.P.R. 89 (1937).

(⁶) Los requisitos para su validez suponen el consentimiento de los contratantes; objeto cierto y la causa de la obligación establecida. Art. 1213 del Código Civil, 31 L.P.R.A. sec. 3391. Véanse: J. Castán Tobeñas, *Derecho Civil español, común y foral*, 13ra ed., Madrid, Ed. Reus, 1983, T. 3, págs. 506–507; J. Puig Brutau, *Fundamentos de Derecho Civil*, 3ra ed., Barcelona, Ed. Bosch, 1988, T. II, Vol. I, pág. 40 y ss. Véanse, además: *Col. Int. Sek P.R., Inc. v. Escribá*, 135 D.P.R. 647 (1994); *Reyes v. Jusino*, 116 D.P.R. 275 (1985); *González Rodríguez v. Fomento*, 38 D.P.R. 556 (1928).

Ruiz— constituyó un incumplimiento sustancial, pues afectaba el precio pactado. *Esa exigencia alteró el precio, elemento esencial del contrato; ya no eran cincuenta mil dólares ($50,000), según pactado, sino setenta y cuatro mil dólares ($74,000).*

Coincidimos con el foro de instancia en cuanto a que la conducta unilateral de Padilla Morales, de obviar los términos del contrato y alterar el precio, choca con nuestro ordenamiento. Éste establece que "la validez y el cumplimiento de los contratos no puede dejarse al arbitrio de uno de los contratantes". Art. 1208 del Código Civil, 31 L.P.R.A. sec. 3373.

El contrato bilateral entre Padilla Morales y Hernández Torres tenía entre sus prestaciones esenciales la entrega del negocio el *Restaurant Tu Casa* y, de otra parte, el pago únicamente de cincuenta mil dólares ($50,000). Padilla Morales cumplió inicialmente con su prestación al entregar el negocio a Hernández Torres; éste, a su vez, con el pago del precio convenido hasta que Padilla Morales insistió en alterarlo al requerirle veinticuatro mil dólares ($24,000) más.

Hernández Torres podía válidamente negarse a asumir dicha deuda, como en efecto lo hizo, y optar por continuar pagando lo que originalmente se obligó, o dar por resuelto el contrato.

El Art. 1077 del Código Civil, 31 L.P.R.A. sec. 3052, dispone, en lo pertinente, que "la facultad de resolver las obligaciones se entiende implícita en las recíprocas, para el caso de que uno de los obligados no cumpliere lo que le incumbe. El perjudicado podrá escoger entre exigir el cumplimiento o la resolución de la obligación, con el resarcimiento de daños y abono de intereses en ambos casos". Así que un contrato válido y efectivo se puede resolver cuando una de las partes no cumple con su obligación principal. Esta acción resolutoria, según Díez-Picazo "es más una medida de protección del interés del contratante cumplidor, permitiéndole desligarse, que una medida de sanción

del incumplimiento". L. Díez-Picazo, *Fundamentos del Derecho Civil Patrimonial*, 2da ed., Madrid, Ed. Tecnos, 1983, Vol. 1, pág. 857. No incidió el tribunal de instancia.

## III

En su segundo señalamiento de error, Padilla Morales alega que objetó oportunamente el testimonio de Hernández Torres por ser novel, versar sobre un aspecto no incluido en la demanda ni en la teoría en la conferencia con antelación al juicio. Además, sostiene que la mejor evidencia sobre los términos del contrato era su texto, no dicho testimonio (prueba extrínseca).

El testimonio aludido estableció la exigencia y el reclamo de Padilla Morales a Hernández Torres de que éste pagara su deuda y la de Sotomayor Ruiz. *No se cometió el error.*

La Regla 4 de Evidencia, 32 L.P.R.A. Ap. IV, dispone que sólo se dejará sin efecto una determinación errónea de admisión de evidencia si dicha determinación fue objetada *oportuna* y correctamente por la parte perjudicada por la admisión, y si ésta fue factor decisivo o sustancial en la sentencia cuya revocación se haya solicitado.

Un análisis cuidadoso de los autos, en particular de la exposición narrativa de la prueba, refleja que al momento de vertirse dicho testimonio, no hubo objeción oportuna alguna por parte de Padilla Morales.([7]) Fue posteriormente, en el redirecto al señor Hernández Torres que, por primera vez, se objetan expresiones referentes a la exigencia de Padilla Morales a Hernández Torres de que éste asumiera la deuda. Dicha materia había sido ampliamente presentada

---

([7]) Interrogatorio directo a Hernández Torres:

"... Lo encontré una vez en la acera y le dije mira me está pasando esto, tú me entregas el dinero para atrás y yo te entrego el negocio. El demandado me dijo, tú arreglas con la señora Ruiz, y hay un señor que viene de Estados Unidos que le interesa el negocio, véndeselo a él y conmigo no hay problemas. Yo le dije, no, no, vamos a dejar esto claro, tu me entregas mi dinero, tú le pagas a la señora y luego hablamos. El señor demandado se trancó y me dijo: no, no, no. Tu [sic] hablas con la señora y vendes el negocio pa'lante, yo le dije al demandado, esto no fue lo que usted acordó conmigo, vamos a dejarlo ahí, y contraté los servicios del Lcdo. Prieto.

durante el directo a Hernández Torres sin que se objetara.[8] No se cumplió con el primer requisito de la citada Regla 4.

Además, el testimonio de Hernández Torres —que fue objetado tardíamente— no fue el único factor que obró en el ánimo del tribunal al determinar que sí ocurrió tal exigencia y, por ende, el incumplimiento contractual. De la

---

"Abogado de co-demandante [sic]:

"¿Cuando usted adquirió el negocio, para efectos suyos qué era lo que usted estaba comprando?

"Sr. Hernández Torres:

"Lo que vi en el periódico fue un negocio equipado. El negocio y el equipo.

"Abogado de co-demandante [sic]:

"Cuando usted le dice al demandado que la señora Laura Ruiz lo está llamando a usted, ¿qué quería el demandado que usted hiciera?

"Sr. Hernández Torres:

"Que le pagara a la Sra. Ruiz los $25,000.00 y que le siguiera pagando el contrato que tenía con Padilla.

"Abogado de co-demandante [sic]:

"Le pregunto, que le pagará a quién los $25,000.00.

"Sr. Hernández Torres:

"$25,000.00 ... se los pagará a la Sra. Laura Ruiz.

"A preguntas del abogado del co-demandante [sic], Hernández Torres contestó:

"Sobre los $25,000.00 que se debían en el contrato, el demandado me dijo que se los pagará él mismo (el demandado). Ya yo había dado $25,000.00, y $25,000.00 que le tenía que seguir pagando en un Pagaré... La compraventa que yo suscribí en el contrato era de $50,000.00. Además de tratar de comunicarme con el demandado para resolver este problema, también entiendo que se le escribió una carta a el demandado, que se la llevé yo personalmente a su oficina. Yo intenté de comunicarme con el demandado más de cinco veces, y no lo conseguí, excepto cuando lo encontré en la calle y hablé con él.

"Abogado de co-demandante [sic]:

"Le pregunto, cuántas veces usted trató de comunicarse con el demandado cuando usted leyó el clasificado en el periódico que vendía el negocio.

"Lcdo. Rafael Sánchez Hernández:

"Vuestro honor, tenemos objeción. Y[a] eso fue contestado...

"Hon. Juez Brocco:

"Se permite.

"Sr. Hernández Torres:

"Yo diría como dos veces, máximo." E.N.P., págs. 46–48.

[8] Re-directo, Hernández Torres [sic]:

"A pregunta[s] de abogado de co-demandante [sic], el señor Hernández Torres testificó:

"Que lo que le motivó a rescindir el contrato fue que la señora Laura Ruiz me llamó y me dijo que el demandado no me podía vender el negocio. Entonces yo traté de comunicarme con el demandado, y cuando le conseguí éste me dijo que le pagara $25,000.00 a doña Laura Ruiz o que lo vendiera y que le pagara también los $1,000.00 mensuales.

"(OBJECIÓN DEL LCDO. RAFAEL SANCHEZ HERNANDEZ, PUES NO ALEGARON EN LA DEMANDA ESAS CUESTIONES ). El Hon. Juez Brocco indicó que si el propósito no era enmendar las alegaciones de la demanda, entonces se permitía esa línea de interrogatorio.

"Abogado de co-demandante [sic]:

exposición narrativa surge que, en repetidas ocasiones, Padilla Morales declaró y sostuvo que le había exigido a Hernández Torres asumir la deuda.[9]

"¿Y qué le dijo la señora Laura Ruiz que iba hacer?
"Lcdo. Rafael Sánchez Hernández:
"Tenemos objeción, eso es hearsay.
"Abogado de co-demandante [sic]:
"No tenemos más preguntas." E.N.P., pág.55.

[9] Testimonio de Padilla Morales:

"¿Por qué no lo debe usted?
"Demandado José Padilla Morales:
"Porque yo vendí el negocio, y entonces la persona a que le vendía, él asumió la deuda...
"Abogado de co-demandante [sic]:
"Le pregunto a usted, ... su Señoría me permite, porque yo este contrato, el original no lo tengo.... porque está estipulado también.

"Abogado de co-demandado [sic]:
"Le pregunto, usted no cree ... que si usted le iba a ganar $25,000.00 en efectivo al momento de la compra, tres meses después, que el señor Sotomayor le dijera, pero mire, págame a mi entonces, coja usted los 50.
"Demandado José Padilla Morales:
"La deuda de él no había que pagarla. La deuda de él era para pagar $1,000.00 mensuales.
"Abogado de co-demandante [sic]:
"Ah. O sea, que lo que usted quería hacer era que con lo que Edwin le iba a deber a usted ... coger los $1,000.00 de Don Edwin y pagárselos a Sotomayor. Ese era el negocio, verdad.
"Demandado José Padilla Morales:
"El asumió la deuda.
"Abogado de co-demandante [sic]:
"¿Quién asumió la deuda?
"Demandado José Padilla Morales:
"El señor, este,...
"Abogado co-demandante [sic]:
"¿Hernández?
"Demandado José Padilla Morales:
"Hernández.
Abogado co-demandante [sic]:
"Le pregunto si ellos alguna vez se reunieron, los tres, usted y ellos dos que están ahí.
"Demandado José Padilla Morales:
"No.

Abogado de demandante:
"Verdad. Okey. O sea, que hasta el momento, en ese contrato no dice que elseñor Hernández le debe al Sr. Sotomayor. Léalo, léalo, y dígame dónde dice que el señor Hernández le va a pagar a Sotomayor.
"Demandado José Padilla Morales:
"Este no. Este fue cuando yo compré.
"Abogado de co-demandante [sic]:
"En el exhibit 2, perdone entonces.
"Demandado José Padilla Morales:
"En este dice, cuánto dio de pronto y que asumió la deuda que yo le debía.

Ahora bien, aún considerando que el testimonio fue objetado oportunamente y que constituyó un factor decisivo en la decisión del tribunal, concluimos que éste era admisible. Nos explicamos. La Regla 69(B) de Evidencia, 32 L.P.R.A. Ap. IV, establece que ante un convenio en el que se hayan incluido todos los términos y las condiciones

"Abogado de co-demandante [sic]:

"¿Dónde lo dice? Búsquemelo, si es tan amable, Don José.

"Demandado José Padilla Morales:

"El precio de compraventa serán las siguientes... $25,000.00 en la firma del presente otorgamiento y el restante mediante asunción de lo adeudado, pagando la suma de $1,000.00 mensuales sin intereses hasta terminar...

"Abogado de co-demandante [sic]:

"¿Dónde dice Sotomayor ahí?

Abogado de co-demandante [sic]:

"¿Dónde dice que el señor Hernández le va a pagar a Sotomayor?

"Abogado de co-demandante [sic]:

"No, no, no ¿Le pregunté, que dónde lo dice ahí?

"Demandado José Padilla Morales:

"Ahí no lo dice.

"Abogado de co-demandante [sic]:

"Okey. Léase la próxima cláusula, la cuarta.

"Demandado José Padilla Morales:

"El comprador no asumirá cuentas a pagar y cuentas a cobrar de clase alguna.

"Abogado de co-demandante [sic]:

"Cuentas a pagar y a cobrar de clase alguna.

"Demandado José Padilla Morales:

"...de mercancía.

"Abogado de co-demandante [sic]:

"Ah, ¿lo dice ahí?

"Demandado José Padilla Morales:

"Si, bueno. Es de mercancía, y las deudas de agua, luz y esas cosas. O sea, de éstas no iba a asumir. Iba a asumir nada más que estas de $5,000.00 pesos.

"Abogado de co-demandante:

"Le pregunto, por qué eso ... o sea, usted se lo dijo al señor Hernández.

"Demandado José Padilla Morales:

"(No se entiende).

"Abogado de co-demandante [sic]:

"El está aquí presente. El señor Hernández está aquí, y lo está demandado a usted ... Pero usted le dijo que iba a asumir esa deuda, que aunque no estaba en este contrato iba a asumir la deuda de Sotomayor.

"Demandado José Padilla Morales:

"Exactamente. Se le dijo, y se lo admitió también al abogado.

"A preguntas de abogado de co-demandante [sic], el demandado contestó:

"Yo quedé a deber ese dinero, los primeros $5,000.00, y los ... se empezaban a pagar después de 30 a 45 días después. La señora venía constantemente a cobrar.Pues yo se los pagué, también, yo se los cobro a él, no hay problema, porque él asumió la deuda.

"Abogado de co-demandante [sic]:

"Dígame si es cierto o no que para efectuar ese negocio usted no le dijo nada a ninguno de los dos (2) (Sotomayor ni a Hernández).

"Demandado:

que constituyen *la verdadera y última intención de las partes*, no se admitirá evidencia extrínseca a su contenido, a menos que se alegue una equivocación o imperfección o cuando la validez del convenio esté en controversia. La regla *no tiene el efecto de excluir otra evidencia de circunstancias según las cuales fue hecho el contrato o con las cuales se relacione.* Tampoco excluye prueba tendente a establecer ilegalidad o fraude en el convenio.

Reiteramos. No estamos ante una mera cuestión evidenciaria, sino ante una importante norma de derecho sustantivo, como parte de la teoría general de las obligaciones y

---

"A Hernández yo se lo dije, pero a Sotomayor no se lo dije. Se lo dije a la mamá de Sotomayor.

"Abogado de co-demandante [sic]:

"Por qué no le pagó a Sotomayor.

"Demandado:

"No es entendible. Asumió la deuda mía, el Sr. Hernández. Cuando yo vendo esto, la persona asume la deuda, razón por la cual yo no tenía que pagarle a Sotomayor. En el contrato que yo hice con el señor Hernández, se habla de que él asumió la deuda.

"Lcdo. Rafael Sánchez Hernández:

"El abogado de co-demandante, está haciendo repetitivo en las preguntas sobre una interpretación del contrato, sobre lo que dice el contrato. Si el contrato dice o no que el señor Hernández asumió la deuda a pagar a Sotomayor. Mi cliente ya contestó lo que él opina sobre lo que dice el contrato, y se le vuelve a preguntar tres veces sobre lo que él ya contestó.

"Hon. Juez Brocco:

"Sin lugar la objeción.

Abogado:

"¿Dónde dice en el contrato que Hernández asume los $25,000.00?

"Testigo:

"En el mismo contrato.

"A preguntas del Abogado de co-demandante [sic], el demandado contestó:

"El contrato dice que hernández va a asumir la deuda que yo tenía. Yo a él (Hernández) se lo dije de la deuda que yo tenía con el señor Sotomayor, y le dije que El (Hernández) asumía la deuda que yo tenía con Sotomayor.

"Abogado de co-demandante [sic]:

"¿Cuánto usted le entregó o pagó a Sotomayor?, y ¿Cuánto era la deuda que supuestamente asumía Hernández?

"Demandado:

"Yo le entregué a Sotomayor $11,000.00 en total. Hernández asumió la deuda para pagar a Sotomayor por $35,000.00. Son $36,000.00 que finalmente Sotomayor obtendría.

"Abogado de co-demandante [sic]:

"¿Cuánto era el total que se acordó que Sotomayor iba a recibir?

"Demandado:

"El total que Sotomayor iba a recibir cuando finalmente Hernández le pagara la deuda asumida, era un total de $35,000.00. Los mil ($1,000.00) adicionales yo se los adelanté de la ... para yo cobrárselo después a Hernández." E.N.P., págs. 11–21.

los contratos.([10]) *Marina Ind., Inc. v. Brown Boveri Corp.*, 114 D.P.R. 64 (1983); *Chaves v. Coop. de Crédito de Isabela*, 103 D.P.R. 892, 894 (1975).

Por otro lado, "[la] aplicación de la regla tiene como premisa que un convenio, oral o escrito, sea integrado, es decir, incluye *todos* los términos y condiciones que constituyen la verdadera y última intención de la partes". (Énfasis suprimido.) E.L. Chiesa, *Practica Procesal Puertorriqueña: Evidencia*, San Juan, Pubs. J.T.S., 1979, Vol. I, Cap. IX, pág. 474. Basta que no se trate de la última intención de las partes para que no sea aplicable la regla.

El tribunal de instancia confirió entero crédito a la prueba de que Padilla Morales intentó alterar los términos del convenio; por lo tanto, era admisible evidencia tendente a establecer la verdadera intención de las partes. Del mismo modo que el Código Civil permite que se modifiquen convenios a través de acuerdos (orales o escritos) posteriores, la regla de evidencia extrínseca no es obstáculo para la presentación de prueba que acredite tales modificaciones, o en igual sentido las desacredite. Chiesa, *op. cit.*, pág. 475. Esa fue la situación en el caso de autos: se permitió prueba tendente a establecer la verdadera intención de las partes, específicamente, que el precio era de cincuenta mil dólares ($50,000) no de setenta y cuatro mil dólares ($74,000) como pretendió Padilla Morales. Era admisible el testimonio de Hernández Torres sobre este extremo.

---

([10]) Como tal, "[u]n tribunal apelativo puede considerar aspectos de 'parole evidence' [prueba extrínseca] que no fueron traídos a la consideración del tribunal de instancia -o fueron mal presentados-, porque no se trata de admisión o exclusión errónea de evidencia, materia gobernada por las Reglas 4 y 5 de Evidencia. Los tribunales de instancia o apelativos pueden considerar motu proprio el derecho sustantivo, independientemente de los planteamientos (o ausencia de ellos) de las partes". E.L. Chiesa, *Práctica Procesal Puertorriqueña: Evidencia,* San Juan, Pubs. J.T.S., 1979, Vol. I, Cap. IX, pág. 477.

## IV

Finalmente, el cuarto señalamiento de error no amerita mucha discusión. *No* alteraremos la determinación de temeridad y los honorarios de abogado. La Regla 44.1 de Procedimiento Civil, 32 L.P.R.A. Ap. III, establece que cuando la parte ha sido temeraria o frívola, el tribunal deberá imponerle una suma razonable en concepto de honorarios de abogado. *González v. The Commonwealth Ins. Co.*, 140 D.P.R. 673 (1996); *Vega v. Luna Torres*, 126 D.P.R. 370 (1990); *Hawayek v. A.F.F.*, 123 D.P.R. 526 (1989); *Santos Bermúdez v. Texaco P.R., Inc.*, 123 D.P.R. 351 (1989); *Fernández v. San Juan Cement Co., Inc.*, 118 D.P.R. 713 (1987); *Raoca Plumbing v. Trans World*, 114 D.P.R. 464 (1983); *Montañez Cruz v. Metropolitan Const. Corp.*, 87 D.P.R. 38 (1962).

Por los fundamentos expuestos, *se confirma la sentencia.*

Lo pronunció, manda el Tribunal y certifica el señor Secretario del Tribunal Supremo. El Juez Asociado Señor Rebollo López emitió una opinión concurrente. La Juez Asociada Señora Naveira de Rodón concurrió con el resultado sin opinión escrita. El Juez Presidente Señor Andréu García disintió sin opinión escrita. El Juez Asociado Señor Hernández Denton disintió por entender improcedente la acción resolutoria, ya que de los hechos no se desprende que hubo incumplimiento de contrato.

(*Fdo.*) Francisco R. Agrait Lladó
*Secretario del Tribunal Supremo*

— O —

Opinión concurrente emitida por el Juez Asociado Señor Rebollo López.

Aun cuando *concurrimos* con el *resultado* al que llega en el presente caso una mayoría de los integrantes del Tribu-

nal —esto es, que procede la *confirmación* de la sentencia emitida por el antiguo Tribunal Superior de Puerto Rico, Sala de San Juan— *diferimos* de uno de los fundamentos en que se apoya la mayoría al así decidir. En específico, *discrepamos* de la posición a los efectos de que resultan aplicables a los hechos del presente caso las disposiciones del Art. 1208 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3373. Exponemos, *de manera breve*, nuestra posición al respecto.

I

El demandando recurrente Padilla Morales le compró un restaurante al codemandante recurrido Sotomayor Ruiz, al cual le quedó a deber cierta cantidad de dinero. Posteriormente, Padilla Morales le vendió el referido restaurante al otro codemandante recurrido Hernández Torres, obligándose este último a pagarle parte del precio de venta en varios plazos. Debe enfatizarse el hecho de que el demandado recurrente Padilla Morales *no* le informó al comprador Hernández Torres de la compraventa efectuada anteriormente con Sotomayor Ruiz y del dinero que a este último él le adeudaba.

Al enterarse Hernández Torres de la referida transacción, e inquirir de Padilla Morales sobre la misma, éste le indicó a Hernández Torres que debía pagarle a él lo adeudado y, *además*, debía satisfacer la deuda que él tenía pendiente con Sotomayor Ruiz. Informado de dicha situación, Hernández Torres se negó a lo pretendido por Padilla Morales, le entregó el negocio a éste, y lo demandó por incumplimiento de contrato y daños y perjuicios. Dicha demanda fue consolidada con la que, a su vez, presentó Sotomayor Ruiz contra Padilla Morales en cobro de su acreencia, relativa la misma a la transacción original.

## II

La mayoría de los integrantes del Tribunal sostiene, al igual que el tribunal de instancia, que resultan aplicables a los hechos del caso las disposiciones del citado artículo 1208 del Código Civil, el cual establece que la "validez y el cumplimiento de los contratos no pueden dejarse al arbitrio de uno de los contratantes". En nuestro criterio, dicha disposición estatutaria lo que prohíbe es que una parte "tenga la facultad para decidir si un contrato existe o no, si está obligada o no", *Flores v. Municipio de Caguas*, 114 D.P.R. 521, 528 (1983), o que una parte pueda decidir, de manera unilateral, incumplir con las disposiciones de un contrato.

Así, la prohibición del Art. 1208 del Código Civil, *supra*, es a los efectos de que " 'no puede quedar al arbitrio de uno de los contratantes la validez y el cumplimiento de los contratos; conceptos ambos que se refieren a *la esencia de la obligación*, a su sustantividad, a su naturaleza, excluyendo así lo accidental. Lo que proh[í]be el legislador es la estipulación por virtud de la cual de la voluntad de un individuo depende la existencia o inexistencia de la obligación, su nacimiento, pero no aquella otra determinación de cómo y hasta cuándo ha de existir, con tal que viva' ". (Énfasis en el original suprimido y énfasis suplido.) *Arroyo & Valiente v. North British & Merc.*, 38 D.P.R. 176, 180 (1928), citando a Q. Scaevola, *Comentarios al Código Civil*, Madrid, Imp. Apalategui, 1904, T. 20, pág. 515.

Por su parte, Manresa ha señalado, respecto al Art. 1252 del Código Civil español, equivalente a nuestro artículo 1208, *supra*, que " '[d]os son, a[su] juicio, los motivos de justicia que fundamentan la terminante prohibición contenida en el artículo de este comentario. Uno, la fuerza del contrato, el otro está en la igualdad esencial de los contratantes que impide quede uno sujeto al convenio y el otro libre de él, con lo cual en rigor sólo habría una voluntad expresada, un sujeto sometido y faltaría verdadero consentimiento' ". *Albizu v. Royal Bank of Canada*, 46 D.P.R. 503,

516 (1934), citando a J.M. Manresa, *Comentarios al Código Civil Español*, Madrid, Imp. Rev. Legislación, 1901, T. VIII, pág. 557.

La situación contemplada por el citado artículo 1208 ciertamente *no* es la que tenemos ante nos. A nuestro juicio, lo que el demandado recurrente Padilla Morales pretendía, con sus acciones, era *alterar* los términos del contrato otorgado con Hernández Torres, obligando a éste a asumir la deuda que él tenía con Sotomayor Ruiz; asunción de deuda que *no* formó parte del contrato de compraventa suscrito por Padilla Morales y Hernández Torres.

Ante esta situación resulta aplicable el principio de *pacta sunt servanda*, que ha sido incorporado a nuestro ordenamiento en el Art. 1210 del Código Civil, 31 L.P.R.A. sec. 3375. Este artículo establece que los "contratos se perfeccionan por el mero consentimiento, y desde entonces obligan, no sólo al *cumplimiento de lo expresamente pactado*, sino también a todas las consecuencias que según su naturaleza, sean conformes a la buena fe, al uso y a la ley". Véase *Unisys v. Ramallo Brothers*, 128 D.P.R. 842 (1991). *De igual modo*, aplica el Art. 1044 de nuestro Código Civil, 31 L.P.R.A. sec. 2994, el cual postula que las "obligaciones que nacen de los contratos tienen fuerza de ley entre las partes contratantes, y deben cumplirse al tenor de los mismos".

## III

En resumen, y dados los hechos particulares del caso ante nuestra consideración, parece ser obvio que el antes citado Art. 1208 del Código Civil, *supra*, resulta ser inaplicable a dichos hechos. Ello, por la sencilla razón de que aquí *no* está en controversia si el contrato de compraventa, otorgado entre Padilla Morales y Hernández Torres, es o no válido, o si el contrato fue, o no, satisfecho.

Lo que sí está en controversia es si una de las partes involucradas en dicho contrato —Padilla Morales— puede, o no, unilateralmente *variar* los términos del mismo; *resul-*

*tando aplicable a dicha situación, repetimos, las disposicio-*
*nes de los antes mencionados Arts. 1210 y 1044 del Código*
*Civil de Puerto Rico.*

Por los fundamentos anteriormente expuestos, es que meramente *concurrimos* con el resultado al que llega la mayoría en el presente caso.